Filed 12/4/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|                                      |                                          |
| ------------------------------------ | ---------------------------------------- |
| THE PEOPLE,                          | B246329                                  |
|     Plaintiff and Respondent, | (Los Angeles County<br>Super. Ct. No. MA054851) |
|     v.           |                                          |
| CHARLES KIRVIN,                      |                                          |
|     Defendant and Appellant. |                              |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kathleen Blanchard, Judge. Affirmed as modified.

Caroline R. Hahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Does a trial court abuse its discretion in denying a criminal defendant the right to represent himself when he has repeatedly refused to come to court and be interviewed by a court-appointed mental health expert?  Is a defendant who makes six separate telephone calls urging a relative to persuade the prosecution's chief witness not to testify at trial entitled, under *People v. Bailey* (1961) 55 Cal.2d 514, to dismissal of all but one of his six convictions for attempting to dissuade a witness?  The answer to both questions is no, and we affirm Defendant Charles Kirvin's convictions and, with one small correction, the 26-year prison sentence imposed in this case.

## FACTS AND PROCEDURAL HISTORY

### I.     Offense Conduct

Al Jesse Cambell (Cambell) was driving Defendant Charles Kirvin (Defendant) and others from Palmdale to Inglewood, California.  Defendant and Cambell were dating.  Upset with how Cambell was eating candy, Defendant punched her in the right eye so hard it bled.  Defendant told Cambell he would hurt her family if she told anyone who hit her; he subsequently drove her to a nearby police station and hospital where she reported that she was hit by a stranger trying to rob her.

A few days later, Defendant grabbed Cambell's arm gruffly after she rebuffed his sexual advances; her arm bruised.  When the police arrived, they noticed Cambell's still swollen eye and she told them the truth about the prior incident.  Defendant was arrested.

Defendant thereafter made several calls from jail urging his sister and others to get Cambell "not to come to court."   Six of these calls were made to Defendant's sister on the same day.

### II.    Procedural History

The People charged Defendant with corporal injury to a cohabitant (Pen. Code, § 273.5, subd. (a)),[1] assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)), and dissuading a witness by force or threat (§ 136.1, subd. (c)(1)) for Defendant's actions in the car; with corporal injury to a cohabitant (§ 273.5, subd. (a)) for grabbing

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

Cambell's arm a few days later; and with 11 counts of attempting to dissuade a witness (§ 136.1, subd. (b)(2)) for the calls from jail.  The People also alleged Defendant's 2002 prior conviction for battery involving serious bodily injury as a "strike" (§ 1170.12, subds. (a) through (d); § 667, subds. (b) through (i)), and as a prior "serious felony" (§ 667, subd. (a)(1)); the People further alleged three prior prison sentences (§ 667.5, subd. (b)).

Prior to trial, Defendant expressed dissatisfaction with his appointed counsel and the trial court held a hearing with Defendant and his lawyer, pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).  At that hearing, Defendant complained that his attorney was not moving the case forward fast enough, and was too willing to "waive time."  Defendant also stated that he was seeing "mental images" "in his head" of his lawyer "flip[ping] [him] off."  The trial court found no basis to appoint new counsel, but declared a doubt about Defendant's competence, suspended the criminal proceedings under section 1368, and appointed two mental health experts to examine Defendant.

After examining Defendant, each expert reported that Defendant had first "hear[d] voices" 18 years earlier, had since been on and off various medications, and had never been hospitalized for any mental issues.  Both experts further opined that Defendant understood the charges against him, the role of the court officers, and what was at stake. They differed in their opinion of whether Defendant could assist his counsel:  Dr. Stephen Wilson thought Defendant could not, while Dr. Kory Knapke thought he could. The court appointed a third expert to evaluate Defendant, but Defendant refused to meet with him on two separate occasions.  The third expert informed the court that he could not render a "direct opinion" without interviewing Defendant, but remarked that the "available information"--namely, the documents available to the expert as well as Defendant's custodial placement outside the psychiatric unit--indicated that Defendant had not overcome the presumption of competency.

After the parties submitted the issue of competency on the reports, the court ruled that Defendant had not rebutted the statutory presumption of competency.  The court cited the absence of any "indication at all that [Defendant] is suffering from any type of

3

mental illness"; the fact that Defendant was not being housed in the mental health unit of the jail; and the concurrence of the two examining experts that "Defendant has a rational, factual understanding of the charges and the nature and purposes of the proceedings." In accord with Dr. Knapke's opinion, the court concluded that Defendant was "able to comprehend his own status and condition in reference to such proceedings and . . . is able to assist counsel in conducting his defense."

At that point, Defendant renewed his earlier request to represent himself, which the trial court had initially postponed until Defendant's competency was determined. The court denied Defendant's request on two grounds. First, the court pointed to Defendant's refusal to leave his cell that morning, and his earlier refusal to meet with the third mental health expert. As the court saw it, Defendant was "playing games," and Defendant's "actions in refusing to come to court and cooperate with doctors appointed by the court are disruptive, obstreperous, disobedient and disrespectful to the court, and his misconduct and its impact . . . affect the integrity of the trial court." Second, the court, citing *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*), noted Defendant, while competent to stand trial, lacked the competency to represent himself.

Defendant immediately exercised a peremptory challenge against the judge under Code of Civil Procedure section 170.6, and a new judge was assigned. Defendant again moved to disqualify his appointed counsel and to represent himself. The court conducted a second *Marsden* hearing, and found no basis upon which to appoint new counsel. The court also denied Defendant's request to represent himself due to (1) Defendant's repeated refusals to come to court and meet with the court-appointed expert; and (2) his misconduct in jail (namely, throwing urine and feces). The court found the sum total of Defendant's behavior to be "disruptive to the fundamental operations of the judicial system."

The case proceeded to trial. The trial court dismissed one of the witness dissuasion counts for insufficient evidence and, in lieu of dismissing the two corporal injury against a cohabitant counts (due to lack of evidence of cohabitation), permitted the People to substitute two counts of misdemeanor battery in a dating relationship (§ 243,

4

subd. (e)(1)). The jury acquitted Defendant of one other witness dissuasion count, but convicted Defendant of the remaining counts. Defendant admitted his prior convictions, and the Court imposed a prison sentence of 26 years, as well as a $200 domestic violence restitution fine under section 1203.097.

## DISCUSSION

### I. Competency

A criminal defendant may not be tried or convicted while mentally incompetent. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 464; *Pate v. Robinson* (1966) 383 U.S. 375, 384-386.) For these purposes, a defendant is mentally incompetent if he (1) """"lacks a '"sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"'""""; or (2) lacks """"""a rational as well as a factual understanding of the proceedings against him."'""""" (*Sattiewhite*, *supra*, 59 Cal.4th at p. 464, quoting *Dusky v. United States* (1960) 362 U.S. 402, 402.) Whenever substantial evidence raises a reasonable doubt regarding the defendant's competence, a court is required to suspend the criminal proceedings and conduct a full competency trial. (§ 1368, subds. (a), (b); *People v. Lightsey* (2012) 54 Cal.4th 668, 691.) At that trial, the defendant is rebuttably presumed to be competent. (§ 1369, subd. (f).) The defendant consequently bears the burden of proving his incompetency by a preponderance of the evidence. (*People v. Blacksher* (2011) 52 Cal.4th 769, 797 (*Blacksher*).) We review a trial court's determination of competency for substantial evidence, viewing the evidence in the light most favorable to that determination. (*Id*. at p. 798; *People v. Poe* (1999) 74 Cal.App.4th 826, 831 (*Poe*).)

Defendant contends that the trial court's competency determination is not supported by substantial evidence because (1) Dr. Wilson found him unable to assist in his own defense; and (2) the trial court should not have relied upon (a) the opinion of the third expert who never interviewed him; or (b) the jail officials' decision not to place him in a mental health unit.

As a threshold matter, we reject the People's argument that Defendant, by "submitting" the matter to the trial court on the basis of the experts' reports, thereby

forfeited his right to challenge that ruling on appeal. To be sure, defendants may not attack the validity of expert reports to which they submit with arguments they did not present to the trial court. (*Blacksher*, *supra*, 52 Cal.4th at pp. 797-798; *People v. Weaver* (2001) 26 Cal.4th 876, 904.) But Defendant objected to several aspects of the third expert's report, and may renew those objections on appeal.

We nevertheless conclude that Defendant's contentions lack merit. Dr. Wilson's opinion is not controlling. Dr. Knapke found Defendant to be competent, and a single witness may establish any fact. (Evid. Code, § 411; *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508.) It is "not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions." (*Poe*, *supra*, 74 Cal.App.4th at p. 831.) There is also no reason to do so, given that both experts agreed that Defendant understood what was going on and what was at stake.

The trial court also did not commit any error vis-à-vis the third expert. Importantly, the court did not cite or otherwise purport to rely on that expert's opinion. But even if it had, courts may lawfully use a third expert as a "tie breaker" (*Blacksher*, *supra*, 52 Cal.4th at p. 798), and may rely upon a report not based on a face-to-face interview when the subject refuses to meet with the expert (*People v. Johnson* (2012) 53 Cal.4th 519, 533 (*Johnson*)). The trial court's observation that jail officials did not view Defendant as needing special accommodation due to mental health issues is also not cause for reversal. Dr. Knapke's report and the court's own observations of Defendant provided ample basis for the court to find that Defendant had not rebutted the presumption of competency; the court's reliance on additional information--even if extraneous--does not undermine the otherwise substantial evidence.

## II.    Self-representation

A criminal defendant has the constitutional right to forego the constitutional guarantee of the assistance of counsel and to represent himself at trial. (*Faretta v. California* (1975) 422 U.S. 806, 817-818 (*Faretta*). This right is "'not absolute.'" (*People v. Butler* (2009) 47 Cal.4th 814, 825 (*Butler*), quoting *Edwards*, *supra*, 554 U.S. at p. 171.) The right to self-representation may be abridged when a defendant engages in

"misconduct that seriously threatens the core integrity of the trial"; if the rule were otherwise, the right to self-representation could be perverted into a "'license not to comply with relevant rules of procedural and substantive law.'" (*People v. Carson* (2005) 35 Cal.4th 1, 8 (*Carson*), quoting *Faretta*, *supra*, 422 U.S. at p. 834, fn. 46.) The right to self-representation may also be denied when a defendant possessing the competency to stand trial nevertheless lacks the competency "to conduct the basic tasks needed to present [one's] own defense without the help of counsel." (*Johnson*, *supra*, 53 Cal.4th at p. 530; *Edwards*, *supra*, 554 U.S. at pp. 175-176).)

The first judge who denied Defendant's request to proceed without counsel relied upon Defendant's misconduct and lack of competency; the second judge relied solely upon Defendant's misconduct. Defendant attacks the second judge's ruling as an abuse of discretion because the judge (1) relied in part upon Defendant's jail misconduct; (2) never spelled out how Defendant's repeated refusal to come out of his cell threatened the integrity of the trial; and (3) never warned Defendant to cease his behavior before denying his request. We review the second judge's ruling for an abuse of discretion (*People v. Welch* (1999) 20 Cal.4th 701, 735), and accord "due deference" to the trial court's assessment of the impact of the Defendant's misconduct on the integrity of the trial (*Carson*, *supra*, 35 Cal.4th at p. 12; see also *People v. Sarpas* (2014) 225 Cal.App.4th 1539, 1552 [abuse of discretion asks whether the court exceeds the "'bounds of reason'"]). That discretion was not abused.

A defendant's *in-court* misconduct can warrant the denial or revocation of a defendant's right to represent himself. (*Faretta*, *supra*, 422 U.S. at p. 834, fn. 46; *Illinois v. Allen* (1970) 397 U.S. 337, 343-344 (*Allen*); *Carson*, *supra*, 35 Cal.4th at p. 8.) So can a defendant's *out-of-court* misconduct, as long as there is a nexus between that misconduct and the trial process. (*Carson*, *supra*, 35 Cal.4th at p. 7.) What matters is "the effect, not the location, of the misconduct and its impact on the core integrity of the trial." (*Id*. at p. 9.) A defendant's out-of-court efforts to intimidate witnesses may consequently justify the denial of self-representation (*id.* at p. 10), but abuse of the privileges accorded to self-represented litigants or misconduct while incarcerated

7

ordinarily do not (*Butler, supra*, 47 Cal.4th at pp. 826-827 [disciplinary infractions in jail; insufficient]; *Carson, supra*, 35 Cal.4th at p. 7 [abuse of pro. per. privileges; insufficient]; *People v. Doss* (2014) 230 Cal.App.4th 46, 55-57 [same]).

Defendant is accordingly correct that his repeated episodes of showering jail officials with his excrement are not, without more, a proper ground for denying his request for self-representation. But this was not the only basis for the second judge's ruling, and we must evaluate whether the court abused its discretion in denying self-representation on the remaining basis--namely, Defendant's willful absences from court and other court-ordered interviews. (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 ["'[W]e review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm.'"].)

The court did not act beyond the "bounds of reason" in concluding that Defendant's repeated refusals to come to court or obey court orders to meet with others would seriously threaten the core integrity of the trial. An in-custody defendant who wishes to represent himself but demonstrates a pattern of refusing to come to court or to leave his cell when ordered puts the trial court on the horns of a dilemma: That court must either (1) halt the court proceedings whenever the defendant decides to remain in his cell (thereby inconveniencing the jurors and witnesses, and playing havoc with the court's busy calendar), or (2) face the unpleasant prospect of proceeding with trial in the absence of the defendant or anyone representing him (in derogation of the strong statutory and constitutional preference that criminal defendants be present during a trial in which their liberty is on the line). (*Allen, supra*, 397 U.S. at p. 342 [noting Sixth Amendment right to be present at trial]; §§ 977, subd. (b)(1), 1043, subd. (a); see also *People v. Williams* (2013) 58 Cal.4th 197, 255 [self-represented defendants have no right to standby counsel].) If, as our Supreme Court has noted, a defendant's refusal to sit in the appropriate place in the courtroom is a basis for denying the right to self-representation (*Carson, supra*, 35 Cal.4th at pp. 10-11), the defendant's total absence from the courtroom surely is.

8

Defendant protests that the trial court did not specifically articulate *why* his repeated refusals to come to court would interfere with his trial, but the court explicitly noted its concern that Defendant's conduct would cause interference; there are no magic words that must always be said, particularly when they would do no more than state the obvious. Nor was there any need for the court to give warnings or to consider alternative remedies in this case. Defendant's refusals were, by their nature, willful and repeated. The second denial of his request for self-representation followed a first, so Defendant was sufficiently forewarned. Further, the trial court had no alternatives to consider; tellingly, Defendant offers none on appeal.

In sum, the trial court did not abuse its discretion in denying Defendant's request to represent himself.

## III.    Consolidation of Convictions

A criminal defendant cannot be *punished* more than once for the same criminal act or for a series of criminal acts committed "incident to one objective." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; § 654.) However, as a general matter, a criminal defendant can suffer multiple *convictions* for a single criminal act or series of related criminal acts. (§ 954 ["The prosecution is not required to elect between . . . different offenses or counts set forth in the accusatory pleading, [and] the defendant may be convicted of any number of the offenses charged."]; accord, *People v. Gonzalez*, __ Cal.4th __, 2014 Cal. LEXIS 9618, 2 ["Section 954 . . . concerns the propriety of multiple convictions, not multiple punishments, which are governed by section 654."]; *In re Arthur V.* (2008) 166 Cal.App.4th 61, 67 (*Arthur V.*) [noting distinction between multiple punishments and multiple convictions].)

Our Supreme Court created an exception to the general rule allowing for multiple convictions in *People v. Bailey*, *supra*, 55 Cal.2d 514 (*Bailey*). *Bailey* held that the People could charge a defendant's ongoing receipt of welfare benefits arising from a single fraudulent application as a single grand theft rather than as discrete, separate petty thefts because the thefts were all committed "pursuant to one intention, one general impulse, and one plan." (*Id.* at p. 519.) Subsequent decisions have construed *Bailey* as

9

being a two-sided coin, granting criminal defendants the right to insist upon the dismissal of all but one conviction when multiple crimes are unified by a single intent, impulse or plan. (E.g., *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1149-1150 (*Tabb*).)

The courts have since struggled with the contours of this "converse *Bailey*" doctrine. The decisions applying this doctrine have cited a variety of rationales, but its applicability ultimately turns on the nature of the underlying crimes at issue. These crimes--and the rule governing them--fall into two categories.

The first category pertains to crimes that treat harm or damage as one of their elements, and which permit the prosecution to aggregate that harm or damage. The most common crimes falling into this category are theft and vandalism. Until recently, the "converse *Bailey*" doctrine applied with full force to this category of offenses, and entitled a defendant to dismissal of all but one conviction for multiple crimes, even if each involved a complete criminal act, as long as the crimes were committed "pursuant to a single general impulse, intention or plan." (*Tabb*, *supra*, 170 Cal.App.4th at p. 1150; see also *People v. Brooks* (1985) 166 Cal.App.3d 24, 30-32 [theft]; *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 363-364 [same]; *Arthur V.*, *supra*, 166 Cal.App.4th at pp. 68-69 [vandalism]; cf. *People v. Carrasco* (2012) 209 Cal.App.4th 715, 717, 719-721 [vandalism]; *People v. Jaska* (2011) 194 Cal.App.4th 971, 980, 984 [same].) This is no longer the case. In *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*), our Supreme Court jettisoned much of this earlier precedent by holding that a defendant could sustain multiple convictions "based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at pp. 740-741.) Indeed, *Whitmer* marked such an abrupt departure from the current law that the court held it was not to be applied retroactively. (*Id.* at pp. 741-742.)

The second category includes all of the other crimes that do not monetize and aggregate harm or damage. By and large, the "converse *Bailey*" doctrine has not been applied to this category of offenses; as a result, a defendant may be convicted of multiple crimes--even if the crimes are part of the same impulse, intention or plan--as long as each conviction reflects a completed criminal act. This is the rule that has been applied to

10

convictions for insurance fraud (*People v. Zanoletti* (2009) 173 Cal.App.4th 547, 559-560); Medi-Cal fraud (*People v. Drake* (1996) 42 Cal.App.4th 592, 597); forgery (*People v. Neder* (1971) 16 Cal.App.3d 846, 852; *People v. Richardson* (1978) 83 Cal.App.3d 853, 866); burglary (*People v. Washington* (1996) 50 Cal.App.4th 568, 575-578 (*Washington*); *People v. Church* (1989) 215 Cal.App.3d 1151, 1159); sex crimes (*People v. Harrison* (1989) 48 Cal.3d 321, 329-332); corporal injury on a spouse (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1477); and identity theft (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 455-457). For a brief time, a handful of California courts prohibited multiple convictions for a series of related criminal acts unless they were separated by an interlude in which the defendant had a "'reasonable opportunity to reflect upon his conduct'" (*In re William S.* (1989) 208 Cal.App.3d 313, 317), but our Supreme Court ultimately rejected that view (*People v. Harrison* (1989) 48 Cal.3d 321, 332; *Washington*, *supra*, 50 Cal.App.4th at pp. 575-576; cf. *People v. Louie* (2012) 203 Cal.App.4th 388, 399 [time to reflect is still part of multiple *punishment* analysis under § 654]).

The California courts have, at times, offered reasons for confining the "converse *Bailey*" to harm-focused crimes. Expanding the doctrine further would exacerbate two of its undesirable side effects: The doctrine effectively grants wrongdoers a "felony discount" by assuring them only one conviction for a potentially limitless number of related offenses (e.g., *In re Arthur V.*, *supra*, 166 Cal.App.4th at p. 67), and it effectively displaces the legislative definitions of what constitutes a completed crime with a new constellation of judicially created "continuous crimes" that come into being should all related burglaries, sex crimes or identity thefts be aggregated into a single "continuous crime" (*Washington*, *supra*, 50 Cal.App.4th at p. 578). Further, a chief benefit of the "converse *Bailey*" doctrine--making sure defendants who engage in conduct that technically constitutes two crimes but practically constitutes one (such as two immediately successive entries into the same home being treated as separate burglaries)--can be just as effectively achieved by the already existing rule prohibiting double

11

*punishment*, and without all of the attendant disadvantages of prohibiting multiple *convictions*.

The crime of attempted dissuasion of a witness falls squarely into the second category because it is not a crime for which harm is monetized or aggregated. To the contrary, that crime is completed once the defendant takes an immediate step toward having another person knowingly and maliciously attempt to persuade a witness from assisting in a prosecution. (*People v. Velazquez* (2011) 201 Cal.App.4th 219, 230; § 136.1, subd. (b)(2)). A separate violation of section 136.1, subdivision (b)(2) was completed each time Defendant placed a call to his sister urging her to persuade Cambell not to go to court. As a result, whether each of Defendant's calls was directed toward the same goal is irrelevant.

Defendant argues that *People v. Salvato* (1991) 234 Cal.App.3d 872 dictates a different result. We disagree. The question in *Salvato* was whether a defendant charged with attempting to dissuade a witness *over a period of time* was entitled to have the People specify (or "elect") which specific acts the People intended to prove at trial. (*Id.* at pp. 878-883.) *Salvato* held that no specification was required because the crime of attempting to dissuade a witness fit within one of the exceptions to the rule mandating election--namely, the exception for offenses contemplating a continuous course of conduct over time. (*Id.* at pp. 882-883.) But the question here is whether the People--having charged specific acts on specific dates (rather than over a time period)--are effectively *required* to allege only one continuous crime of attempted dissuasion. This is a different question than the one presented in *Salvato*. *Salvato* dealt with whether the People *may* allege violations of section 136.1 as a continuous crime, while this case deals with whether the People *must* do so. More to the point, reading *Salvato* as Defendant suggests would effectively engraft the "converse *Bailey*" doctrine onto the second category of crimes discussed above. This is an outcome *Salvato* nowhere mentions, and one considerably at odds with the weight of case authority and the latest pronouncement from our Supreme Court in *Whitmer* narrowing the "converse *Bailey*" doctrine.

12

The trial court did not err in allowing all of Defendant's six convictions for dissuading a witness on the same day to stand.

## IV.    Restitution Fine

Defendant lastly argues that the trial court should not have imposed the then $200 domestic violence restitution fine because he was sentenced to prison and the fine is to be imposed only when a defendant is "granted probation."  (§ 1203.097, subd. (a)(5)(A).)  The People agree with Defendant on this point, and so do we.

## CONCLUSION

The abstract of judgment shall be modified to delete the $200 domestic violence restitution fine.  Otherwise, the judgment is affirmed.

## **CERTIFIED FOR PUBLICATION.**

_____, J.
                    HOFFSTADT

We concur:


_____, P. J.
        BOREN


_____, J.
        ASHMANN-GERST

13